Robert H. Lawson, Adm'r of the Estate of Sarah Lawson, Deceased, *et al.*, Plaintiffs-Appellants, *v.* G. D. Searle & Company, Defendant-Appellee.

(No. 58000;

First District (4th Division)—May 28, 1975.

BURMAN, J., dissenting.

James A. Dooley, of Chicago, for appellants.

Baker & McKenzie and Sidley & Austin, both of Chicago (Francis D. Morrissey, Thomas F. Tobin, John T. Coleman, Edward J. Zulkey, William P. Richmond, and James W. Kissel, of counsel), for appellee.

Mr. PRESIDING JUSTICE DIERINGER delivered the opinion of the court:

This is an appeal from a judgment entered by the Circuit Court of Cook County in favor of the defendant. It is an action in strict liability in tort to recover damages for the death of Sarah Lawson and for injuries sustained by Joanne Holmes due to their use of the contraceptive drug, Enovid.

The issues presented on appeal are: (1) whether it was prejudicial error to send to the jury room a book, defendant's exhibit 45, which was never received in evidence at any stage of the trial, when both the trial court and opposing counsel believed the exhibit referred to after the proofs were closed was another document; (2) whether it was permissible to permit one of defendant's witnesses, on direct examination, to recite clinical studies made by third persons; (3) whether counsel for defendant engaged in prejudicial conduct by continually offering exhibits and asking questions which had previously been ruled on by the court; (4) whether defendant's failure to respect certain notices for production of documents under Supreme Court Rule 237 constituted prejudicial error; and (5) whether in a strict liability case where the issue is the unreasonably dangerous character of a drug, the benefits of the drug should be balanced against its risks.

In April, 1971, the plaintiffs, Robert Lawson, as administrator of the estate of Sarah Lawson, deceased, and Joanne Holmes and Karl Holmes, brought an action against the defendant, G. D. Searle & Company, to recover damages for the death of Sarah Lawson and for injuries sustained by Joanne Holmes due to their use of the contraceptive drug, Enovid.

Mrs. Lawson, 25 years old, the mother of five, was in generally good health until July, 1962, when the drug was prescribed for a menstrual

problem. She developed symptoms. It became necessary to hospitalize her in August and again on September 1, shortly before she passed away. An autopsy confirmed the diagnosis of pulmonary embolism made by the attending doctor. Multiple blood clots, none older than 6 to 8 weeks, were found.

Mrs. Holmes, in prior good health, was prescribed the pill, and shortly thereafter suffered shortness of breathing and inability to talk. She was hospitalized and placed on anticoagulants. A diagnosis of pulmonary embolism was made.

The record shows Enovid has a significant history. In 1961, two young women, Enovid users, died in Los Angeles as the result of thrombophlebitis, causing pulmonary embolism and death. Doctors in the employ of defendant went to the west coast and could find nothing unusual in either person predisposing to these conditions.

In 1961, Dr. Rappaport, a hematologist, was employed to study the effects of the drug. He found a statistically significant difference in the blood clotting of nonusers as opposed to contraceptive users.

On July 24, 1963, Dr. Pilgeram, another hematologist, advised defendant: "Insofar as Envoid is concerned, it is now my opinion, in opposition to my early stand, that the current evidence militates against the use of Enovid."

In 1968, two English doctors, Vessey and Inman, extensively studied the relationship between the oral contraceptive and thromboembolic disorders. It was found that such conditions were found nine times greater in users than in nonusers.

In 1968, the Department of Health, Education and Welfare advised the American medical profession "The British studies (Inman and Vessey) confirm what long had been suspected, namely, there is a definite association between the use of oral contraceptives and the incidents of thromboembolic disorders."

In a publication of defendant entitled "Family Planning With The Pill, a Manual for Nurses," it is stated: "Studies conducted in Great Britain and reported in April 1968 estimate there is a seven to tenfold increase in mortality and morbidity due to thromboembolic diseases in women taking oral contraceptives."

In 1970, the Department of Health, Education and Welfare entered a regulation that the users of the drug be given a warning. (35 Fed. Reg. 9002-3.) This was the first time in the history of prescription drugs in the United States that the manufacturer was directed to warn the consumer.

In 1970, the prescribing doctor was advised, "An increased risk of thromboembolic disease associated with the use of hormonal contracep-

tives has now been shown in studies conducted in both Great Britain and the United States."

In 1970, Searle, in accord with the Food and Drug Administration, told the consumer, "the oral contraceptives are powerful and effective drugs which can cause side effects in some users and should not be used at all by some women. The most serious known side effect is abnormal blood clotting which can be fatal."

Inman in 1970 stated: "We conclude that the data collected independently in the three countries leaves no doubt that there is positive correlation between the risk of thromboembolism and the dose of estrogen in oral contraceptives." This was the same person whose earlier studies had been alluded to by defendant in its literature.

Plaintiffs offered medical evidence as to the relationship between the condition of both women and defendant's drug. Other substantial evidence was likewise received. There were 110 case reports to defendant from doctors with patients without predisposing causes who had developed thromboembolic conditions after using Enovid. Some of these were fatal and included autopsy reports.

On the cross-examination of defendant's experts, outstanding medical authorities were shown to recognize a definite relationship between oral contraceptives and blood clotting.

Defendant's position in the trial court in substance was that: (1) it was licensed by the Federal Drug Administration; (2) it is not known whether there is a relationship between thromboembolic disorders and oral contraceptives; and (3) "association" does not mean relationship.

██ Licensing by the Food and Drug Administration means no more than that the drug has met the standards of that body. These are minimum standards and not meant to encroach upon the law of products liability. *D'Arienzo v. Clairol, Inc.* (1973), 125 N.J. Super. 224, 310 A.2d 106; *Arata v. Tonegato* (1957), 152 Cal. App.2d 837, 314 P.2d 130; *Rumsey v. Freeway Manor Minimax* (Tex. Civ. App. 1968), 423 S.W.2d 387.

██ Defendant's position that it does not know whether there is a relationship between oral contraceptives and thromboembolic disorders is not consistent with its duty. As a manufacturer, it is held to the degree of knowledge and skill of experts. *Lewis v. Stran Steel Corp.*, 57 Ill.2d 94; *Moren v. Samuel M. Langston Co.*, 96 Ill.App.2d 133.

"Association" might well mean relationship, particularly when, amongst many of the documents in evidence, defendant in its own records or in advices from the Food and Drug Administration were aware of the significant association between thrombosis and the use of oral contraceptives.

Much of defendant's evidence attacked the British studies, which it had repeatedly alluded to in its literature. From the record as a whole, it appears that such studies were recognized throughout the world as the leading ones.

Defendant urged that if there is evidence to support the verdict, any errors should be ignored. We cannot do this. *Duffy v. Cortesi*, 2 Ill.2d 511; *Crane Co. v. Hogan*, 228 Ill. 338.

Defendant's exhibit 41, throughout the trial, was referred to as the "Ad Hoc Committee Report." This is a 1963 report to the Food and Drug Administration concerning oral contraceptives. Defendant's exhibit 45, labelled "Second Report On The Oral Contraceptives," was referred to as the "Hellman Report." Both documents were printed by the FDA.

Throughout the trial, on numerous occasions, defendant offered into evidence these exhibits. The offer was denied, with the court, on occasion, instructing the jury to disregard such offer.

The British reports of Doctors Inman and Vessey repeatedly referred to in defendant's literature were received in evidence on behalf of the plaintiffs.

At the conclusion of all the evidence, the trial court erroneously believed one of the two Government publications heretofore described should be received. His basis was that such was a corporate record of defendant.

■■■ If these were corporate records (which they were not) they could not be admissible to support a corporate claim. In *Nelson v. Union Wire Rope Co.*, 31 Ill.2d 69, 115, it is stated:

> "As a general rule any statement, written or not, made by a party or in his behalf which is inconsistent with his present position may be introduced in evidence against him. (Conrad, Modern Trial Evidence, vol. 1, sec. 454; Cleary, Handbook of Illinois Evidence, sec. 13.10; *Brown v. Calumet River Railway Co.*, 125 Ill. 600.) Where the question has arisen, authorities are in accord that advertisements, brochures, newspaper items, catalogs, and the like are admissible and relevant to the subject matter of the suit where they contain statements of a party inconsistent with a claim or a position asserted by such party in the action. (*Henkle v. Smith*, 21 Ill. 237; 20 Am. Jur. Evidence, 1960 Supp. p. 152; 44 A.L.R. 2d 1031; *Hartford Steam Boiler Inspection & Insurance Co. v. Pabst Brewing Co.* (7th Cir.) 201 F. 617, 629; *Fryer v. New York Brokerage Co.* 152 Iowa 688, 133 N.W. 110; *cf. Mahlstedt v. Ideal Lighting Co.* 271 Ill. 154.)"

At the afternoon instruction conference, plaintiffs were given a choice

of which document they would agree to. Their position was that neither was admissible.

Before argument to the jury the following morning, counsel for defendant advised the court, "the only thing left open was his ruling on the Ad Hoc Committee Report." The court admitted into evidence the "Ad Hoc Committee Report." At the time of the offer, the exhibit was neither identified by number nor was it present.

During defendant's counsel's argument, defendant's exhibit 45, which had been referred to as the "Hellman Committee Report," was read from. Plaintiff's counsel objected, but was overruled. Certain parts of the document which defendant's counsel read from were objected to, and the objection was sustained. A recess was declared.

In response to inquiry by the court, defendant's counsel represented that before the arguments, he had referred to the exhibit by number. This was not correct. The court observed he believed there was only one "Ad Hoc Committee Report" and asked to be shown where defendant's exhibit 45, the "Hellman Committee Report," was referred to in defendant's literature, since this was the basis of his admission. He noted what counsel for defendant showed him was not in its literature. Obviously, court and counsel for plaintiffs did not know what document was being received.

Plaintiffs made a motion to withdraw a juror and declare a mistrial or, in the alternative, to recall the jury into the courtroom and instruct them that any reference to defendant's exhibit 45, the "Second Report On The Oral Contraceptives," or the "Hellman Committee Report" should be disregarded. This motion was denied, and the document sent to the jury room. The 7-week trial there ended.

Defendant's exhibit 45, "Second Report On The Oral Contraceptives," by the Advisory Committee on Obstetrics and Gynecology, Food and Drug Administration, is a book of 88 pages. It covers many matters completely immaterial to the issues.

The conclusion of the Committee, amongst other matters, read thus:

"Although the Kefauver-Harris Amendments of 1962 indicate that the term 'safe' has reference to health of man, nowhere do they define safety. Discussing this subject before the Subcommittee of the Committee on Government Operations of the House of Representatives, the Commissioner of FDA pointed out that *no effective drug can be absolutely safe*. Therefore, *evaluating safety of a drug requires weighing benefit against risk*." (Italics ours.)

Again, it reads thus:

"Specific risks as well as requisite practices for follow up of

patients have been detailed in the labeling of all hormonal contraceptives. When these potential hazards and the value of the drugs are balanced, the Committee finds the ratio of benefit to risk sufficiently high to *justify the designation safe within the intent of the legislation.*" (Italics ours.)

■■ Strict liability in tort is not predicated upon legislation, nor is it the law that "no effective drug can be absolutely safe." *Singer v. Sterling Drug Co.* (7th Cir. 1972), 461 F.2d 288, 292; *Cunningham v. MacNeal Memorial Hospital,* 47 Ill.2d 443.

The term "defect" in a strict liability in tort action has a broad and inexact definition, as was observed in *Dunham v. Vaughan & Bushnell Manufacturing Co.,* 42 Ill.2d 339, 342:

> "Although the definitions of the term 'defect' in the context of products liability law use varying language, all of them rest upon the common premise that those products are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function."

The definition of "safe" in the pamphlet which went to the jury was contrary to the meaning of "defect" within the strict liability in tort doctrine.

During the direct examination of Dr. Drill, an employee of defendant, the court was advised defendant had "a room full of charts" to show the jury. Plaintiffs were granted a *voir dire* examination of the witness. It appeared that Dr. Drill had prepared charts based on the clinical studies published by others. For the most part, these were defendant's clinical investigators. From 53 studies, certain charts had been drawn. These had to do with whether a particular investigator had a case of thrombophlebitis and, if so, the number of persons using oral contraceptives. While the court would not allow the charts which contained excerpts to be shown the jury, he ruled that the witness would be permitted to state the specific reports and the studies made by others. Plaintiffs specifically objected, but the trial court stated his ruling was based on *Darling v. Charleston Community Memorial Hospital,* 33 Ill.2d 326.

*Darling* does not permit a witness to collect materials from experiences of third persons and to so relate them on direct examination. On the contrary, *Darling* is limited to cross-examination.

> "To prevent cross-examination upon the relevant body of knowledge serves only to protect the ignorant or unscrupulous expert witness. In our opinion expert testimony will be a more effective tool in the attainment of justice if cross-examination is permitted

as to the views of recognized authorities * * *." 33 Ill.2d 326, 336.

■■ In this procedure, plaintiffs could not test the accuracy of the studies or the surrounding circumstances since none who made them was before the court for cross-examination. This was hearsay, and it was prejudicial error to allow the witness to give such evidence. In *Mehochko v. Gold Seal Co.*, 66 Ill.App.2d 54, the trial court allowed a doctor on direct examination to read the results of a test conducted by an independent biological laboratory. The appellate court reversed, stating:

> "The tests were not before the court and he [Dr. Lederer] could not be cross-examined about the method (save what he read about it) nor about the tester's qualifications to perform the experiments and correctly interpret the results. Dr. Lederer was a stranger to the evidence he introduced. He knew nothing about it save through hearsay; he could not be cross-examined about the essence of the independent tests." (66 Ill.App.2d 54, 58.)

Likewise in the instant case, Dr. Drill was unfamiliar with the studies he recited and could not be cross-examined about those studies.

■■ Textbooks have never been admitted in Illinois to prove an issue of fact. (*North Chicago Rolling Mill Co. v. Monka*, 107 Ill. 340, 344; *Brodie v. City of Lewistown*, 164 Ill.App. 335, 337. Also, see 84 A.L.R. 2d 1338, 1341.) If such were proper, then plaintiffs could have offered as evidence the multiple writings adverse to defendant's position. We do not believe such a radical procedure would further the administration of justice. It was prejudicial error to overrule plaintiffs' specific and timely objections to such evidence.

■■ Complaint is made concerning an alleged violation of Supreme Court Rule 237. The purpose of this rule is to obviate the necessity of the service of a subpoena upon a party to whom such notice is directed. *Larson v. Commonwealth Edison Co.*, 33 Ill.2d 316, 325, 326.

On March 31, 1971, plaintiffs served upon defendant a notice to produce Dr. Winter, together with, among other things, the following:

> "All contraindications, warnings, etc., pertaining to Enovid, as well as the date of the printing of each of the said contraindications or warnings and the vehicle in which such contraindications or warnings appeared from 1960 through 1970."

On April 6, 1971, prior to the commencement of the trial, this notice was considered paragraph by paragraph. The court ruled that the matters from 1960 through 1970 would be relevant. Counsel for defendant advised the court that he desired time to talk with Dr. Winter, whose

presence was required by the notice, "in view of the court's rulings to produce these various documents."

On April 12, before opening statements had been made, the court again suggested that there be produced "all requested documentation under the rules of materiality or relevancy which have been in effect in Illinois on the principles of liability or the integrity of the product involved." The same date, counsel for plaintiffs again requested the documents. Defendant stated most of them were ready and would be produced in court. The court advised that he was not interested in "games" and that the material should be produced in his chambers. On the forenoon of April 13, when counsel for plaintiffs again requested the documents, the court stated he had ruled the documents were to be produced and their admissibility would be determined at the time they were offered. He referred to his memorandum statement of April 12. Subsequent requests were made from time to time.

After Dr. Winter had testified, and it had developed that in 1970 the Food and Drug Administration had enacted certain regulations concerning oral contraceptives, another request to produce correspondence between the defendant and the Food and Drug Administration was made. When plaintiffs insisted on compliance with the notices, defendant represented to the court that plaintiffs' counsel had agreed to accept only matters going to 1968. There is nothing in the record to support this, and it would seem strange that a lawyer who had urged from the outset he wanted material through 1970 should be content with 1968. The court, admitting he could not recall what occurred, stated he had to go on the representations of counsel for defendant. Accordingly, no material beyond 1968 was produced.

Plaintiffs were thus deprived of the following important evidence:

1. Correspondence between the defendant and the FDA in 1970 concerning a booklet, "What You Should Know About The Pill."

2. The booklet itself entitled, "What You Should Know About The Pill" distributed to all users.

3. The warning given dispensing physicians in May 1970 to the effect that an increased risk of thromboembolic disease associated with the use of oral contraceptives has been shown in studies in Great Britain and the United States.

4. The package insert employed in 1970, which unlike the one in evidence (1968) to the effect that side effects were not confirmed nor refuted, stated that a significant association has been demonstrated between oral contraceptives and thrombophlebitis. This change was pursuant to the Food and Drug Administration.

Such conduct by counsel for defendant cannot be countenanced. It is obvious the court first ruled the 1970 documents were to be produced and they were withheld because such material was particularly damaging.

Counsel for a litigant has a right to assume that his adversary, upon a notice to produce, has produced all the material called for unless there is a question of privilege. In this event, the matters claimed to be privileged should be shown to the court, who can *in camera* decide that question. See *Drehle v. Fleming*, 49 Ill.2d 293, for an expression of duty of disclosure.

It is urged it was error to permit evidence that oral contraceptives do not cause blood clotting. We have described how the defendant in its literature repeatedly referred to abnormal blood clotting as a known side effect, and that an association between oral contraceptives and thrombophlebitis had been demonstrated. Moreover, the Commissioner of Food and Drugs issued a regulation in 1970 concerning warnings to be given to oral contraceptive users to the effect that the most important known complication was blood clotting. Defendant did not object, but complied with the regulation. *Lilly v. Grand Trunk Western R.R. Co.*, 317 U.S. 481, 488; *Federal Security Administrator v. Quaker Oats Co.*, 318 U.S. 218, 228; *Brunetto Cheese Manufacturing Corp. v. Celebrezze* (2d Cir. 1966), 356 F.2d 874, 875, 876; *Carter-Wallace, Inc. v. Gardner* (4th Cir. 1969), 417 F.2d 1086, 1089.

■■ Under all the facts and circumstances we conclude that oral contraceptives can cause blood clotting. (*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494.) In so stating, we do not hold that any oral contraceptive user who suffers a vascular condition is entitled to recover as a matter of law automatically. Each case must be determined upon its own facts, particularly the causal relationship.

At the close of all the evidence, plaintiffs moved for a finding on the issue of liability. This was denied, but renewed in their post trial motion.

■■ In the Holmes case, the court ruled properly as it is a question of fact for the jury. The Lawson case requires careful consideration as to the proof adduced. Although defendant urged that she had some prior ailment, such is not borne out by the record. Dr. Gaba had seen her in 1958 for childbirth and again in 1959 for the same purpose. Apart from being overweight, she was in good health. Dr. Richard Neely saw her in July 1962 for pain in menstruation. She had no history of thrombophlebitis nor any complaints related to such a condition. He prescribed Enovid. He again saw her in the emergency room at a hospital on August 20, 1962. She was suffering from pain in the upper quadrant

of the abdomen, which had existed a couple of days. Her blood pressure and laboratory findings were normal, and she was discharged on August 29, 1962, without any symptoms.

On September 1, she returned to the hospital and was seen by Dr. Ulveling, an internist, in the emergency room. She became cyanotic and developed a rapid heartbeat. On the third day there was a massive swelling of the leg due to an obstruction of the main vein. She went into shock. A pulmonary embolism developed, notwithstanding measures to break up blood clots and maintain the blood pressure, as well as consultation with specialists. She expired on September 5 due to multiple pulmonary emboli—an uncommon condition in a 25-year-old woman. An autopsy was performed. Blood clots, not older than 6 to 8 weeks, were found. The pathologist's diagnosis was death as the result of thrombophlebitis with complicating pulmonary embolism. No other abnormalities, other than those associated with these conditions, were found. The attending doctor diagnosed the condition due to oral contraceptives.

Two doctors were examined hypothetically by defendant in Mrs. Lawson's case. Dr. Isaacs stated that all he could say was there was not enough evidence to indicate whether or not Mrs. Lawson's condition was associated with the pill. He suggested that the etiology of her condition might have been due to obesity and hospital bed rest, but admitted that if the blood clots were only 6 to 8 weeks old, she had them when she entered the hospital for the first time. He also admitted that the finding of blood clots by the pathologist was something he did not hear on direct examination. Isaacs' testimony was of no evidentiary value.

Dr. Buckingham, the other expert presented by defendant in this particular case, was a specialist in pulmonary diseases. He admitted Mrs. Lawson died of a pulmonary embolism caused by thrombophlebitis. He assumed, contrary to the evidence, that such resulted from her prior pregnancies and also contrary to the findings of the pathoolgist. This, however, was not the evidence. The uncontradicted facts, as shown at the trial, were that the woman had no problems with prior pregnancies, no preexisting thrombophlebitis, and that death was due to pulmonary embolism, with blood clots not older than 6 to 8 weeks.

■■ As was observed in *Pritchett v. Steinker Trucking Co.*, 108 Ill. App.2d 371, 376-77:

> "In order for an expert to testify as to his opinion, the law wisely requires that he be questioned in the frame of a hypothetical question which contains the hypothetical facts, but which facts are in evidence in the proceedings. Undisputed facts cannot be ignored. Opp v. Pryor, 294 Ill 538, 128 NE 580 (1920); Mc-

Carthy v. Spring Valley Coal Co., 232 Ill 473, 83 NE 957 (1908); Sanitary Dist. of Chicago v. Industrial Commission, 343 Ill 236, 175 NE 372 (1931). His opinion cannot * * * be based upon facts not presented to the jury. Louisville, N. A. & C. R. Co. v. Shires, 108 Ill 617 (1884); Kanne v. Metropolitan Life Ins. Co., 310 Ill App 524, 34 NE2d 732 (1st Dist 1941); Butler v. Palm, 36 Ill App2d 351, 184 NE2d 633 (2nd Dist. 1962)."

■■ Upon examination of this lengthy record, we find Mrs. Lawson free from any thromboembolic disorder until ingesting Enovid; that within a short time, she developed thrombophlebitis terminating in a blood clot causing her death. The findings on autopsy, together with the extensive evidence that oral contraceptives cause such disorders, lead to the inescapable conclusion that her death was caused by defendant's drug. We think the motion of the plaintiff for a directed verdict at the close of all the evidence could have been properly allowed upon considering the competent evidence above mentioned. (*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504.) Inasmuch as the court denied the motion and we find the verdict of the jury against the manifest weight of the evidence, we are reversing the judgment in the case of Robert H. Lawson, administrator of the Estate of Sarah Lawson, deceased, and remanding the case for a new trial on all the issues.

In a similar case involving a drug, the circuit court of appeals reversed a defendant's judgment and remanded the cause for a new trial solely on the issue of damages. *Singer v. Sterling Drug, Inc.* (7th Cir. 1972), 461 F.2d 288.

For the reasons stated herein the judgment in the case of Joanne Holmes and Karl D. Holmes is reversed because of the trial errors and because the verdict of the jury is against the manifest weight of the evidence. The case is remanded for a new trial on all issues.

■■ Since these cases will be retried, some comment about trial errors is necessary. It was improper for defense counsel to misread to plaintiffs' expert, Dr. Hillabrand, his testimony at a prior trial. He was entitled to a correct version of his statement so that he might be afforded an opportunity to explain. *Helgesen v. Chicago Suburban Water & Light Co.*, 156 Ill.App.2d 541, 549; *Reilly Tar & Chemical Corp.. v. Lewis*, 326 Ill.App. 84.

■■ Throughout the trial, exhibits which the court had held inadmissible were repeatedly reoffered in the presence of the jury. Plaintiffs' counsel, after the court had sustained objection, was asked by defendant's counsel to stipulate to the admissibility of a document and defendant's counsel repeatedly made prejudicial remarks.

■■ Defendant's objections to a hypothetical question urged that it did

not contain contents of exhibits which exhibits had been ruled inadmissible and other matters not in evidence. These were not true objections, but an argument by defense counsel which brought before the jury improper matters. Such conduct by defense counsel was highly prejudicial.

■■ A doctor for plaintiff Holmes was cross-examined about an alleged preexisting condition on the representation that such would be shown. No such effort was made and finally it was conceded that this condition did not exist, a practice long condemned in our courts and highly prejudicial. *Marut v. Costello*, 53 Ill.App.2d 340, 34 Ill.2d 125.

■■ Comment must be made about the number of expert witnesses. The policy of the doctrine of strict liability in tort is protection of the consumer.

> "On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; * * *." (Restatement (Second) of Torts, § 402A, Comment c (1965).)

See Prosser, *The Fall of the Citadel*, 50 Minn. L. Rev. 791 (1966).

If such a purpose is to be accomplished, there should be some limitation on the number of experts, particularly when the seller, because of its financial dealings, is peculiarly well equipped to obtain expert testimony—a fact borne out by this record. Here. defendant produced Dr. Winter and Dr. Drill, two of its employees, together with Dr. Sise, an experimenter for defendant, and Dr. Isaacs and Dr. Buckingham. When defendant announced its intent to call a sixth expert, a Dr. Goldzieher, plaintiffs made a motion that there be no further experts. The court ruled this particular expert could be allowed on an issue of depression claimed by Mrs. Holmes. Nonetheless, defendant covered the entire area of oral contraceptives over plaintiffs' objection. When plaintiffs made a motion to strike the witness' testimony on other matters, the court stated it "might cast indications that it is not worthy of belief," and at the same time stated he had been "misled" by defendant's counsel. The testimony should have been stricken.

A court has inherent power to limit the number of expert witnesses on either side. (*Geohegan v. Union Electric R.R. Co.*, 266 Ill. 482, 488.) This is particularly important in a products strict liability action.

■■ We suggest trial courts determine the number of expert witnesses each litigant will be permitted by holding a conference on the subject before trial.

A careful study of this lengthy record shows a totality of errors

prejudicial to the plaintiffs, and for all the reasons stated both the Lawson case and the Holmes case are reversed and remanded for new trials on all the issues.

Reversed and remanded for new trials.

ADESKO, J., concurs.

Mr. JUSTICE BURMAN, dissenting:

As indicated in the majority opinion, the plaintiffs brought an action in strict liability in tort to recover damages for the death of Sarah Lawson and for injuries sustained by Joanne Holmes, allegedly caused by the prescribed use of the contraceptive drug, Enovid. After a hotly contested trial of some 7 weeks, the jury returned a general verdict for the defendant and judgment was entered on the verdict. No contention is made here that the jury was improperly instructed as to the law. Both sides were represented by exceptionally qualified trial lawyers and both parties presented extensive evidence, including expert testimony. In my view, there was presented to the jury a substantial dispute as to the liability of the defendant, and, viewing the trial as a whole, I believe it was fair and that judgments should be affirmed.

I first direct attention to the majority's opinion that the evidence leads to the "inescapable conclusion" that Sarah Lawson's death was caused by the defendant's drug. Although the majority states, apparently in dictum, that plaintiff's motion for a directed verdict in the Lawson case *could* have been properly allowed, it holds only that the jury verdict in that case is against the manifest weight of the evidence and remands the cause for a new trial on all the issues. I disagree.

It is beyond question that in determining whether a directed verdict is appropriate all inferences which can reasonably be drawn from the evidence must be construed in favor of the party opposing the directed verdict. (*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504.) Thus in determining whether a directed verdict "could have been" granted in the Lawson case, all the evidence must be viewed in its aspect most favorable to the defendant, Searle. In considering whether a new trial is appropriate, based on the evidence, the reviewing court may not substitute its own opinion as to where the preponderance of the evidence lies as if it were the finder of fact, but can only reverse if the jury's determination is against the manifest weight of the evidence. *Lau v. West Towns Bus Co.*, 16 Ill.2d 442, 158 N.E.2d 63.

A general verdict of no liability on the part of the defendant was returned by the jury. There are a number of issues presented, any one of which, if found in the defendant's favor, would compel that verdict.

Since no special interrogatories were submitted on those issues, we can only speculate as to the precise basis for the jury's determination. But if any one possible basis is supported by the evidence at trial, a new trial, let alone a directed verdict, would not be in order.

With this in mind, I find substantial evidence at trial indicating first that Enovid does not cause blood clotting at all. And, even assuming *arguendo* that it could in certain instances cause clotting, there was secondly substantial evidence that the drug did not cause the specific injuries which led to Mrs. Lawson's death. Dr. John Hillabrand was the only witness on plaintiffs' behalf to testify emphatically, based on a hypothetical question, that in his opinion Mrs. Lawson's condition was caused by Enovid. Two eminently qualified expert witnesses, both Dr. Isaacs and Dr. Buckingham, appearing on behalf of defendant, were given the same hypothetical as plaintiffs' witness. Both stated it was their opinion that Mrs. Lawson's death was not caused by Enovid. Both doctors felt, based in part on the pathologist's finding during autopsy of older, rechannelized clots in Mrs. Lawson's pelvic area, that the presence of other factors (obesity and five prior childbirths) was the cause of the condition leading to her death. Dr. Hillabrand basically eliminated these factors, and thus there was clearly sufficient evidence on the issue favorable to the defendant to warrant its presentation to the jury and to support the verdict. There thirdly existed at trial, in my opinion, a substantial dispute as to whether the drug was "unreasonably dangerous" under the law upon which the jury was instructed. All these conclusions will be discussed in more detail below.

It was alleged by plaintiffs that both Mrs. Lawson and Mrs. Holmes suffered from "pulmonary embolism"—which refers to a blood clot or thrombus which has traveled through the bloodstream from some other site and has lodged in the lung. It is pointed out that normally the originating site of an embolus is a thrombophlebitis in the pelvis or legs. The word "thrombophlebitis" refers to a blood clot or thrombus in a vein (phlebo) which is inflamed (itis). According to defendant, thromboembolic disorders occur in both men and women, have been known to medical science for hundreds of years, and have been associated with various predisposing conditions, including infection, trauma, and obesity.

The subject birth control drug Envoid is an endocrine preparation which substitutes for the natural hormones, estrogen and progesterone. Like the natural hormones, Enovid secretes matter directly into the bloodstream. The function of the pituitary gland in the brain is thereby suppressed to the extent of preventing the release of an egg by the ovary. Enovid is a "prescription drug" as provided by statute and by the regulations of the United States Food and Drug Administration. It

was placed on the market for control of menstrual disturbances in 1957, and later, in 1960, it was additionally approved for use as an oral contraceptive. It continues to be so approved today.

Under the pleadings, the plaintiffs originally premised their actions on both negligence and strict liability theories, but dismissed the negligence counts during the trial. The cause was submitted to the jurors under the doctrine of strict liability in tort. (Restatement (Second) of Torts § 402A (1965).) The plaintiffs had the burden of proving, as instructed by the court, two basic propositions: first, "that the condition of Enovid was unreasonably dangerous  *  *  *  at the time it left the control of the defendant;" and second, "that the condition of Enovid was a proximate cause of the condition of ill-being complained of in each case." The jurors were also instructed that "[a] product faultlessly made may be deemed to be unreasonably dangerous if it is not safe for such a use that is to be expected to be made of it and no warning is given."

In my opinion, there was ample evidence first, to warrant the submission of the question of proximate cause to the jury and to sustain a finding that such did not exist. At issue initially in this regard was whether thromboembolic disease occurs more frequently among people using Enovid, and whether any mechanism of action stimulated by Enovid use could be shown to cause the disease. Numerous studies have been made and published in medical literature concerning the subject, and each of the various avenues of investigation, including studies of blood coagulation factors, statistical studies, and studies of effects upon blood vessels, has been explored. All of these subjects were presented to the jurors and properly considered by them at trial, along with the testimony of defendant's witnesses who perceived no cause and effect relationship between Enovid and blood clotting.

Dr. John Isaacs, an obstetrician and gynecologist in private practice, as well as a professor at Loyola University School of Medicine, testified for the defendant and was of the opinion that it has not "been shown that the oral contraceptive causes thrombophlebitis or pulmonary embolism," and that the British and American retrospective case control statistical studies do not show cause and effect.

Dr. Joseph W. Goldzieher testified for the defendant that he was Director of the Division of Clinical Sciences at Southwest Foundation for Research and Education in San Antonio, Texas, a nonprofit research organization dedicated to research in biochemical sciences. He participated in studying in considerable detail since the early 1960's the question of a possible relationship between oral contraceptives and pulmonary embolism. His opinion was "[t]hat there is absolutely no connection between the two." He pointed to significant flaws in the

retrospective case control statistical studies, which showed at best only "association."

Dr. Herbert S. Sise, an expert in hematology and cardiology from Boston, Massachusetts, author of numerous articles in his area of specialization, and an associate professor of medicine in Boston, explained in detail the nature of the clotting process in blood and the history of idiopathic thrombosis in both men and women long before oral contraceptives were invented. He testified for the defendant that he had studied blood coagulation factors in users and nonusers of Enovid and that the changes in the levels of blood coagulation factors which he observed, and which others had reported in the literature, did not mean that blood was more likely to clot in the veins or arteries. He also pointed out certain flaws in the retrospective case control studies.

Dr. Victor A. Drill, who was defendant Searle's Director of Biological Research, testified to the studies done on Enovid and stated that the prospective clinical studies of oral contraceptives, including Enovid, in over 800,000 cycles of use showed no higher incidence of thromboembolic episodes than would be expected in a comparable untreated population. He pointed out various weaknesses in the retrospective case control studies, and illustrated that such studies can never show cause and effect, but only statistical association. He testified that Enovid does not cause clotting in users.

Dr. Irwin C. Winter, defendant Searle's Vice President of Medical Affairs, responsible for clinical research on Enovid, testified as to the care exercised by Searle during the clinical investigations of Enovid and the investigation of the question on whether Enovid had anything to do with clotting problems in users. He testified that in his opinion Enovid did not cause clotting problems in users, and explained the content and basis for the various pieces of labeling and the changes which had been made from time to time in conjunction with the Food and Drug Administration as information continued to accumulate on the question.

The defendant's expert witnesses thus testified uniformly that Enovid does not cause thrombophlebitis or pulmonary embolism. They disputed the significance of retrospective case control studies pointed to by the plaintiffs, indicating that these studies, because of the nature of the methods used, could do no more than reveal an "association" between pill use and thromboembolic disorder, and not causation, which was the real issue at hand. Although these studies may be widely recognized, the jury was properly allowed to evaluate and weigh their significance in determining the question of causation. It was further pointed out that the changes in blood coagulation levels, asserted by the plaintiffs to be associated with pill use, are not necessarily indicative of increased

clotting. Further the defendant's testimony can be construed to refute the claim that Enovid use creates a condition in the female similar to pregnancy, and that the risk of thrombophlebitis normally increases during pregnancy. It was testified by Dr. Sise and Dr. Winter that there is no increased incidence of clotting disorders during pregnancy—only after the trauma of childbirth—, and it appears inaccurate to characterize the condition in the female during pill use as substantially similar to that of pregnancy in any event. Viewing all the evidence, including that of the plaintiffs (much of which is set out in the majority opinion), I deem it improper to conclude, based on the record before us, either that Enovid was shown at trial to cause blood clotting as a matter of law, or that for the jury to have found otherwise would be against the manifest weight of the evidence.

Even if the jury felt that, in some cases, Enovid could cause thromboembolic disorder, the plaintiffs still were taxed with the burden of proving, as alluded to earlier, that the specific injuries claimed were caused by Enovid, and not due to another cause, either known or idiopathic.

Mrs. Lawson (the only one of the two women whose case the majority felt required "careful consideration of the proof adduced") began taking Enovid in July 1962 upon prescription by her physician, Dr. Richard S. Neely, for a menstrual problem, not for contraceptive purposes. In the latter part of August, 1962, she became ill and was hospitalized. She died on September 5, 1962. An autopsy confirmed the diagnosis of pulmonary embolism made by her attending physician.

Dr. John J. Marra testified by deposition that he conducted the autopsy. Based upon a reasonable degree of medical certainty, he felt he could not express any opinion as to the cause of Mrs. Lawson's thromboembolic condition. He specifically stated that he had no opinion as to whether Enovid proximately contributed to her injuries.

Dr. Neely testified by deposition that he prescribed Enovid in July 1962 to Mrs. Lawson to regulate her irregular menstrual cycle, and not for contraceptive purposes. He noted at the time that she had a retroverted (tipped) uterus, could be characterized as obese, and had given birth to five children by the time she was 23 years old. Further, shortly before her death, Dr. Neely also treated her for a gastric infection and for a gall bladder problem.

As alluded to earlier, both Dr. John Isaacs and Dr. William B. Buckingham, testified for the defendant in response to hypothetical questions that in their opinion Mrs. Lawson's injuries were not related to Enovid. Both of them felt that other, predisposing factors which were present were the cause of her condition—e.g., obesity and trauma due to prior

deliveries. It was noted that the pathologist conducting the autopsy found older rechannelized clots in Mrs. Lawson's pelvic area.

The only emphatic testimony connecting Mrs. Lawson's death to the use of Enovid came from Dr. Hillabrand, and in answering the hypothetical question eliciting that opinion he eliminated as causal factors both her obesity and her five prior deliveries. Again, the evidence presented surely necessitated a jury determination of the issue and supports the verdict returned.

Perhaps even more substantial than these issues of causation was the question of whether the condition of Enovid was unreasonably dangerous at the time it left the defendant's control. As indicated earlier, the court instructed the jury that "[a] product faultlessly made may be deemed to be unreasonably dangerous if it is not safe for such a use that is to be expected to be made of it *and no warning is given.*" (Emphasis added.) This instruction appears inspired partly by Comment k to section 402A of the Restatement (Second) of Torts (1965), relating to "[u]navoidably unsafe products" in the realm of strict products liability. In Comment k it is stated:

> "There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken

to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk." Emphasis added.

There is no centention here that the Enovid involved was not "faultlessly" made in the sense of being adulterated. Further, Enovid is a prescription drug and according to the defendant a "new drug" under provisions of Federal law, and warnings based on available medical knowledge accompanied its distribution. (Cf. *Singer v. Sterling Drug, Inc.* (7th Cir. 1972), 461 F.2d 288.) Based on the above instruction and restatement comment, it therefore appears that the jury's determination of whether Enovid was unreasonably dangerous properly included a consideration of the adequacy of any warnings accompanying distribution of the drug. (See *Basko v. Sterling Drug, Inc.* (2nd Cir. 1969), 416 F.2d 417; *Sterling Drug, Inc. v. Yarrow* (8th Cir. 1969), 408 F.2d 978, 992-93; *Carmichael v. Reitz* (1971), 17 Cal.App.3d 958, 95 Cal.Rptr. 381.) Many millions of women have used oral contraceptives, and the labeling of the drugs has been revised from time to time to include new knowledge about possible side-effects of the drugs—including the possibility of thromboembolic disorder. The prescribing physician relies upon such information. The evidence at trial includes the warnings given and the medical knowledge regarding Enovid available to Searle at about the time the drug was prescribed to the women involved. A jury question on the issue was clearly presented. To proclaim that a directed verdict on the issue of whether the drug was "unreasonably dangerous," could have been properly allowed—as was indicated—sub silentio in the majority opinion with regard to the Lawson case—is therefore inappropriate. It is further inappropriate to find that a jury's verdict on the issue favorable to the defendant would be against the manifest weight of the evidence.

Although counsel for plaintiffs does not challenge on appeal the propriety of the trial court's instruction regarding the defendant's duty to warn, he argues that the adequacy of the warnings was not really at issue in the case. He apparently felt differently at trial as indicated by his comments on several occasions:

"Q. [directed to Dr. Hillabrand by defendant's counsel]: Doctor, would you say that constituted inadequate warning?

MR. DOOLEY: That's objected to, Your Honor. That's an ultimate issue to be determined by the triers of the facts, not for any witness to express an opinion.

\* \* \*

Q. But when you read the package literature, package insert, and the PDR, you understood it as a physician?

A. Yes, yes.

Q. And you would expect other physicians who are gynecologists and coversant with women's problems to understand it?

A. Yes.

Q. And it would constitute a warning to a physician, such as yourself, as to those conditions, is that right?

MR. DOOLEY: Same objection, if the Court please. Same objection. That will be an issue of fact for the jury to determine under all the facts and circumstances."

I believe that the warnings were an issue in the case, and concur that, under all the evidence, the jury had to determine their adequacy. And on the evidence presented, it could properly have found them adequate.

I further must disagree with the majority of my brethren that the plaintiffs' allegations of prejudicial trial error warrant a reversal of the judgment and a new trial on all the issues in both the Lawson case and the Holmes case.

One of the plaintiffs' most adamant contentions of trial error revolves around defendant's exhibit 45—a document entitled the "Second Report On Oral Contraceptives," compiled by the Advisory Committee on Obstetrics and Gynecology, Food and Drug Administration, in 1969. It is argued first that this exhibit was never intended to be allowed into evidence by the court, but was nevertheless erroneously sent to the jury room because of confusion between its identity and the identity of another exhibit, defendant's exhibit 41, the 1963 "Wright" or "Ad Hoc" Committee Report.

As will be pointed out in greater detail later, the record indicates that throughout the trial the jurors and the court were made aware of defendant's exhibit 45, the 1969 "Second Report on Oral Contraceptives," sponsored by the United States Government. It was referred to by counsel for both parties during examination of various doctors, and even referred to by plaintiffs' counsel in his opening statement to the jury.

Near the end of the trial, on May 17, 1971, an extensive discussion was held on the defendant's motion to admit into evidence three exhibits: a 1963 report to the Food and Drug Administration on oral contraceptives, sometimes referred to as the "Ad Hoc Committee Report" or the "Wright Committee Report" (defendant's exhibit 41); a 1966 FDA report, sometimes referred to as the "first Hellman Committee Report" defendant's exhibit 43); and the 1969 report, sometimes referred to as the "Second Report on Oral Contraceptives" or the "second Hellman Report" (defendant's exhibit 45). First the 1963 report, defendant's exhibit 41, was offered into evidence by the defendant, on a theory of admissibility to be discussed later. Plaintiffs' counsel objected, claiming *inter alia* that

the report was obsolete and superseded by the later Hellman reports. After heated argument by both counsel, the court seemed to agree with counsel for the defendant that the report was admissible, concluding:

"THE COURT: If there is [*sic*] any cases, bring it in tomorrow and we will take it up again. But let's get on now.

MR. DOOLEY [plaintiffs' counsel]: Well, none of these [defendant's cases] support this position.

THE COURT: If you can bring in later committee reports that are referred to in their literature and offer them, I will be happy to consider that tomorrow morning."

After brief discussion regarding a different exhibit, defendant's counsel offered the 1966 FDA report, defendant's exhibit 43, into evidence, and plaintiffs' counsel objected. The court responded: "The objection will be sustained. Re-offer it in the morning after I go over the cases."

Another brief discussion regarding other exhibits intervened before defendant's counsel offered exhibit 45 into evidence. An objection was made by plaintiffs' counsel and argument ensued. At one point the following colloquy occurred:

"MR. TOBIN [defendant's counsel]: I think the jury is entitled to receive both reports [apparently the 1963 and 1969 reports] and make a consideration based on the evidence they have heard which report is in fact the one they wish to follow.

THE COURT: I'm ruling that way, but I don't think you should have five reports in.

MR. TOBIN: We're just talking about two.

THE COURT: Or two reports. I think you're both entitled to one report and either the '69 or '64 [*sic*]. My own opinion is that it would be the Ad Hoc committee report would be more appropriate.

MR. RICHMOND [defendant's cocounsel]: They're both Ad Hoc committee reports. There are three. One was in '63 and one was '66 and one in '69, your Honor.

THE COURT: But Bill [Mr. Richmond], the theory of your case though is that the state of the art or the state of the knowledge or the scientific is no different today than it was then.

MR. RICHMOND: No, not at all. The state of the medical knowledge has continued to progress, your Honor. It's just that they haven't shown a cause and effect relationship. But for example, the way to compare our '63 literature on what was known to compare it to the Ad Hoc committee report. In '66, we come to the '66 report and in '65, and we attempted to show that our warning was consistent at all times [*sic*].

THE COURT: My inclination is to leave the '69 report in rather than the '64 report."

A short time later during the argument regarding exhibit 45, the court stated in responding to plaintiffs' counsel's argument against admissibility:

"THE COURT: The Court [on plaintiffs' request] has permitted the Inman and Vessey reports in as part of their literature because it contained—it was referred to in their literature and it contained causal relation. Now they want to introduce as explanatory literature other reports. And based on the rule, the rules as I see them, I am compelled to allow them to introduce as much as will explain. Now, if you have any cases that I am in error on—

MR. DOOLEY: You [defendant's cocounsel] cited a case. What case was it?

MR. RICHMOND: Why don't you look at it tonight?

THE COURT: I have indicated what I intend to do and we'll go into it in the morning. * * *"

On the morning of the following day, May 18, 1971, the following colloquy occurred:

"MR. TOBIN [defendant's counsel]: The only other thing we have open that I know of is the Court had held open the ruling on the Ad Hoc Committee Report.

THE COURT: No. I ruled on that. That goes in.

MR. TOBIN: I didn't hear it.

THE COURT: I said that it was in subject to cases being produced, and no cases were produced.

MR. DOOLEY: The only cases that I can find on the question, your Honor, is corporation records are not admissible to establish or support a corporate claim. * * *"

During closing argument, counsel for the defendant read from exhibit 45. Plaintiff objected on the ground that it was not in evidence. The court overruled the objection by stating: "Yes, that is in evidence." Defendant's counsel resumed his argument. A short time later a similar objection was interposed by plaintiffs' counsel:

"MR. DOOLEY: Just a minute. That's [the 1969 report] not in evidence, if the Court please.

THE COURT: Yes, it is. We had that up this morning.

MR. DOOLEY: The Ad Hoc Committee as [sic] the Wright Report, if the Court please, and that is what the Court admitted into evidence.

MR. TOBIN: That's [the 1969 report] the Ad Hoc Committee.

THE COURT: Yes, that's correct."

A recess was later declared during defendant's final argument, during which time plaintiffs' counsel pursued the question of whether exhibit 45 was ever placed into evidence. He asserted that the 1963 Ad Hoc Committee Report was the one in evidence, not the 1969 report. Defendant's counsel responded that exhibit 45 was the second Hellman Ad Hoc Committee Report. The court said, "I can't recall the appearance of it and I have to take their [defendant's counsel] word," and then later:

"THE COURT: Mr. Dooley, I recall yesterday your objection to it. I recall your objection yesterday. I recall my advising Counsel that when you objected to one on the basis of time, I recall advising Counsel that I would leave them have one in because of the Inman and Vesy [sic] and I feel it was part of their literature to explain they were entitled to it, this morning. But you objected, that there were cases that indicated that that was not appropriate and it was set down to this morning. The matter was raised again this morning. I assumed you knew what exhibit was going in."

The court then tried to determine whether the report had been referred to by number that morning when allegedly admitted. Defendant's counsel felt that he had referred to it by number (although a reading of the record will show that he was mistaken in that regard). The court stated it would look at the record later to determine if any "basic unfairness" had occurred.

Following the conclusion of the closing arguments, plaintiffs' counsel specifically objected to the 1969 Hellman Committee Report (exhibit 45) going to the jury, setting forth many matters contained therein which he deemed immaterial, including the Chairman's conclusions. The court stated:

"Mr. Dooley, I stated to counsel in the argument that on the day that we had the exhibits on record, when they attempted to offer two committee reports in or three committee reports in, I said that I did not feel that the three committee reports could be in.  *  *  *

The following morning they came in here with an Ad Hoc Committee Report. I did not know particularly which one they were referring to, because I had assumed there was only one ad hoc committee.  *  *  *"

The court then engendered some discussion as to whether the 1969 report was referred to in the defendant's literature, and therefore admissible for that reason. He concluded by stating that he would submit the exhibit to the jury at the time but would take plaintiffs' motion for mistrial with the case and decide it at a later time.

Subsequently, after the jury verdict had been rendered, the plaintiffs' post-trial motion in regard to the alleged inadmissibility of exhibit 45 was denied.

It does not take a careful reading of the above excerpts from the record to make it apparent that some confusion did exist with regard to the admission *vel non* of exhibit 45. The record sufficiently reveals to me, however, that despite that confusion, the exhibit was actually received into evidence, and that the trial court was aware of its contents and was not misled regarding its admission. He clearly stated his intention during discussion on May 17 to allow certain of the committee reports into evidence. He allowed an "Ad Hoc Committee Report," unidentified by number at the time, into evidence the following morning. Although admitting later to some uncertainty as to the identity of the exhibit actually placed ino evidence on the morning of the 18th, there can be no doubt he knowingly deemed the 1969 report properly in evidence and allowed it to go to the jury. He denied plaintiffs' post-trial motion directed to that issue, and that fact must be given much weight. It appears rather presumptuous to me to tell the trial court judge that he never intended to place exhibit 45 into evidence when he himself reaffirmed, and justified at some length, his decision to do so.

The plaintiffs also argue that, even if defendant's exhibit 45 was meant to be admitted into evidence by the trial court, error was committed because the exhibit was inadmissible hearsay evidence containing matters prejudicial to the plaintiffs' case.

In a broad sense, the report is hearsay since it contains assertions made by persons who never testified at trial. The defendant, however, posits two theories of admissibility for the exhibit. One is that, as a recognized learned medical writing, it falls within the "learned treatise" exception to the hearsay rule.

Although this exception has as of yet had but limited acceptance by the judiciary, it is espoused, and quite persuasively, by various authorities, most notably Wigmore. (See 6 Wigmore, Evidence §§ 1690—92 (3rd ed. 1940).) Wigmore feels that the two requisites to the recognition of an exception to hearsay, necessity and the probability of trustworthiness, are present in the case of competent treatises or medical writings, at least to the degree present in other recognized exceptions. The necessity exists because it is undesirable to condition the availability of the expert opinions and conclusions of eminent authors on a party's ability to produce the authors themselves at trial. This is especially true when it is considered that the ordinary expert witness who does testify at a trial many times himself has no knowledge derived from personal observation, but virtually reproduces conclusions of others which he accepts

on the authority of the eminent names responsible for them. (6 Wigmore, Evidence § 1691 (3rd ed. 1940).) The trustworthiness of learned treatise exists because (1) the writer customarily lacks motive to misrepresent, since his statements may be biased in favor of a theory he believes is true, but not in favor of a lawsuit or of an individual, (2) the writer publishes primarily for his profession, which subjects his work to professional scrutiny and criticism, and (3) the probability of accuracy should customarily be greater than that found in the testimony of an expert witness who is remunerated by one of the litigants. Wigmore, § 1692.

Agreement with the adoption of a hearsay exception for learned treatises can be found elsewhere, including Rule 63(31) of the Uniform Rules of Evidence, adopted in 1953 by the National Conference of Commissioners on Uniform State Laws, and which provides:

> "A published treatise, periodical or pamphlet on a subject of history, science or art [is admissible] to prove the truth of a matter stated therein if the judge takes judicial notice, or a witness expert in the subject testified, that the treatise, periodical or pamphlet is a reliable authority in the subject."

(See also *Lewandowski v. Preferred Risk Mutual Insurance Co.* (1966), 33 Wis.2d 69, 146 N.W.2d 505.) Furthermore, the Illinois Supreme Court has, on at least one occasion, recognized that although the rule against the admissibility of "learned treatises" is supported by the considerations that support the hearsay rule, Wigmore has "convincingly demonstrated" the inapplicability of those considerations to such works (*Darling v. Charleston Community Memorial Hospital*, 33 Ill.2d 326, 335, 211 N.E.2d 253, 259.) Although in *Darling* the use of recognized authorities contained in treatises or periodicals written for professional colleagues was apparently held permissible only on cross-examination, the same policy considerations would seem to favor their use, with proper safeguards and limitations, as substantive evidence.

This is especially true in the case at bar when the nature of the writing under scrutiny is considered. The competence of the authors of exhibit 45, the 1969 FDA report, was never questioned. Witnesses for the plaintiffs testified that the authors and the chairman of the report were considered leaders in their particular fields of specialization. Furthermore the report was sponsored by the United States Government without any aid or participation of defendant, Searle, and is a matter of public record. The Advisory Committee on Obstetrics and Gynecology was formed by the United States Food and Drug Administration to specifically study, advise and inform the FDA as to the safety of oral contraceptives. Subsequently the FDA promulgated the Committee's findings and conclu-

sions in exhibit 45, entitled the "Second Report on Oral Contraceptives," and insisted that this report be made a part of the labeling and official literature of the manufacturers of oral contraceptives. Even a cautious approach to extending the use of learned treatises beyond cross-examination might well begin with a case such as this.

A second theory of admissibility for defendant's exhibit 45 is more amorphous, but, when one considers the entire trial, even more compelling.

We first point out in this regard, that, as alluded to earlier, counsel for plaintiffs himself, throughout the trial constantly made referrence to, and relied upon defendant's exhibit 45 (the 1969 Hellman Report), or subject matter favorable to plaintiffs which formed the basis of the exhibit. For example, in his opening statement he remarked:

> "Now, I might say that in addition thereto, in 1969, the FDA appointed a committee headed by a Dr. Hellman, and that committee came to the conclusion that insofar as causal relationship between Enovid and thromboembolic disorders, the question was no longer open for debate. In fact, in addition thereto, in their literature, the defendant says, "Statistical information illustrates a relationship between Enovid and thromboembolic disorders, liver dysfunction, and pulmonary embolism."

Then, on numerous occasions either on cross-examination or direct examination of several doctors he also referred to the 1969 Hellman Report, and often to certain of the findings contained therein. These references are noted at page 57 of defendant's brief on appeal, and need not be detailed by me here.[1] Although the evidentiary justification for certain of these references is unclear (those on cross-examination might be justified on the basis of the rule in *Darling v. Charleston Community Memorial Hospital*, 33 Ill.2d 326, 211 N.E.2d 253, that an expert may be cross-examined through the use of a learned writing recognized as authoritative in the field), I believe the defendant was properly allowed to answer them by directing the jury's attention to another portion of the same document, either on the theory, as suggested by the defendant, that a party may not use aspects of an evidentiary whole and then seek to exclude the rest (*Cf. Morris v. Jamieson*, 205 Ill. 87, 68 N.E. 742; *Boudinot v. Winter*, 190 Ill. 394, 60 N.E. 553) or on a theory akin to

---

[1] Although some of the alleged references by plaintiffs' counsel to the 1969 Hellman report, identified in defendant's brief by page number of the record at which they appear, are validly deemed incorrect by plaintiffs, I find most of them to be entirely accurate.

that of "curative admissibility" (See, *e.g.,* McCormick on Evidence § 57, at 131-133 (2nd ed. 1972).

Certain comments of the trial court judge in denying plaintiffs' post-trial motion regarding exhibit 45 are especially pertinent in this regard:

> "It is true the court was liberal in connection with literature relating to the product involved and thrombophlebitis.
>
> * * *
>
> In this case, the court in the first instance permitted the plaintiff the use of scientific literature and numerous case reports on the theory that they were expressed in the defendant's own literature, on cross examination under the Darling rule or other rules relating to exception of the hearsay rule.
>
> To have foreclosed the defendant as the plaintiffs have suggested and urged the court ought to have done would have permitted plaintiffs under rules of evidence with which he persuaded the court were applicable and entitled him to use scientific literature without giving the defendant a fair opportunity to make his defense and to submit all the facts to the jury, to be weighed by them upon evidence legitimately bearing upon such facts."

I agree with the trial court's conclusion that plaintiffs' use of exhibit 45 during examination of certain witnesses is inconsistent with the argument that it was improperly used by defendant's counsel. The repeated reference to the exhibit by plaintiffs certainly required its admission in order that the jury could consider all of the document, including those portions favorable to the defendant's case.

Another allegation of error concurred in by the majority of this court and forming a basis for reversal concerns the direct examination by defendant of Dr. Victor Drill, who was allowed during examination to recite studies made by third parties.

Notwithstanding my view that Dr. Drill's testimony could not have prejudicially influenced the result of this 7-week trial, during the course of which both parties exposed the jury to numerous types of statistical studies, I feel his reference to the studies was justified. As the defendant points out, plaintiffs themselves placed in issue the question of whether Searle had properly reflected the existing state of medical knowledge in the labeling as it was revised from time to time. In order to properly evaluate this issue, the jury would need to know what information was available to Searle at the time the labeling was made up. Dr. Drill, along with Dr. Winter, was primarily responsible for the medical information which went into the labeling of Enovid. Since it would not

be possible, nor desirable, for one doctor to conduct all the studies necessary to determine the impact of a prescription drug in the thousands of women involved in clinical investigations over more than a million cycles of use, Dr. Drill, in order to perform his function, was involved in the assessment of the results of clinical investigations conducted by others. On this basis he participated in the decision to prepare labeling in the form eventually submitted to the Food and Drug Administration for approval. It was thus proper for him not only to state his own conclusions and decisions, but to explain, under the issues as posed at trial, the bases for those conclusions and decisions, including the findings of certain selected studies relied upon by him.

The plaintiffs further assert that they were prejudiced by the defendant's alleged failure to comply with their notices to produce certain documents pursuant to Illinois Supreme Court Rule 237 (Ill. Rev. Stat. 1973, ch. 110A, par. 237), primarily because they were thereby deprived of the use of a booklet entitled "What You Should Know About 'The Pill,'" distributed to users by the American Medical Association; correspondence between the defendant and the FDA regarding the booklet; a warning to physicians regarding the increased risks of thromboembolic disorders associated with pill use; and a revised package insert.

Lengthy conferences were held regarding the production notices, during which broad requests were made by plaintiffs' counsel. The transcript of these discussions is again undoubtedly not a paragon of clarity —perhaps understandable because of the complexities of the litigation. A final colloquy between the court and counsel later during the trial on the matter of the documents at issue, however, can easily be construed in favor of defendant's position—that an untranscribed conference was held during which plaintiffs' counsel agreed to the production of documents up to 1968 only. Those in question came into existence subsequent to that time. Although the majority points to the trial court's statement at one point during that colloquy that he "[couldn't] recall" the year referred to in conference, the following also appears in the same context.

"MR. RICHMOND [defendant's cocounsel]:

\* \* \*

Mr. Dooley also requested correspondence in 1968 relating to thrombophlebitis labeling changes.

The record should show that I'm handing to Mr. Dooley letters—

MR. DOOLEY: Through '70 when the changes were made.

MR. TOBIN [defendant's counsel]: No, no.

MR. DOOLEY: Yes, I did.

MR. TOBIN: Mr. Dooley, we had that out in the chambers. You said you'd settle for '68.

THE COURT: That was the Court's impression.

MR. DOOLEY: No, that was the other day, Judge. When they made these changes in '70—

THE COURT: You indicated, Mr. Dooley, the Court said up until December.

MR. RICHMOND: The changes were made in 1968, referring to the British studies.

MR. TOBIN: He said he would be satisfied with that. We went and got it.

THE COURT: I recall that, that's correct.

\* \* \*

MR. DOOLEY: With reference to that, Your Honor, insofar as the changes are concerned, as I say, what they have given me is actually nothing because none of them refer to the particular warnings which are now in effect.

I gave them a written notice to request which included through '70. I know the Court ruled on the 1969—on the case reports up 'till 1969 but—

MR. TOBIN: The Court ruled expressly on the 1968 correspondence, and that's what it was limited to.

MR. DOOLEY: Why should it be limited to '68?

MR. TOBIN: We have complied with the Court's order.

MR. DOOLEY: Well, this is nothing.

THE COURT: The Court was under the impression, Mr. Dooley, when it made its ruling on the situation that you were satisfied with that.

MR. TOBIN: That's correct.

MR. DOOLEY: Judge, I think we are confusing what happened—I said on the case reports, I recall, but I think insofar as last Monday when I served this notice on them, the notice provided in writing to '70.

THE COURT: No question of what the notice provided, Mr. Dooley, but there was a conference in chambers on it; and I assumed that you were satisfied with the submission \* \* \* of the '68, and I recall in the record a discussion concerning that; and you indicated at least or you led the Court to believe that that would be satisfactory to your taste."

As a further indication of the trial court judge's recollection and understanding of any agreement regarding the production of documents, it

again should be considered that he denied plaintiffs' post-trial motion—including claims of prejudice because of defendant's refusal to produce documents pursuant to Rule 237—in its entirety.

Furthermore it is not evident that the brochure "What You Should Know About 'The Pill'" was encompassed in plaintiffs' notices to produce. Paragraph 7 of the first notice requested the following:

"7. All contra-indications, warnings, etc., pertaining to Enovid, as well as the date of the printing of each such contra-indications or warnings and the vehicle in which such contra-indications or warnings appeared from 1960 through 1970."

A subsequent notice directed the defendant "to produce all correspondence between G. D. Searle & Company and the Food and Drug Administration between 1959 and 1970 concerning the drugs Enovid, Enovid E., Ovulen, Dimulen." The defendant points out that the pamphlet itself was published and distributed by the American Medical Association, and Searle did not assist, nor was it requested to assist, in its preparation. Further, it contains no reference to "the drugs Enovid, Enovid E., Ovulen, [or] Dimulen." The trial judge's remarks in his ruling on the post-trial motion with regard to this matter are again pertinent, and reflective of his intention during the trial with regard to the entire issue of compliance with Rule 237.

"There is no order of court in the proceedings that this court can conclude was ignored or neglectfully complied with by defendant's counsel in connection with the production of the referred to pamphlet or correspondence relating thereto.

\* \* \*

\* \* \* In considering the trial of this cause, the matters and material filed subsequent to trial, the court cannot and does not conclude that there was a failure on the part of the defendant to comply with production orders of the court.

It's true that counsel for the defendant vigorously resisted plaintiffs' motion of production, but the failure to produce the document 'What You Should Know About the Pill' and the correspondence relating thereto appear to be based upon the defendant's determination that the document was not defendant's literature and did not relate to Enovid but birth control pills and were not within the production requirements of the court.

The motion of the plaintiffs filed during the trial and prior to the trial relating to documents in evidence were specific; but with respect to the document of 'What You Should Know About the Pill' and/or correspondence between the defendant and the Pure

Food and Drug Administration, based upon the motions, affidavits, and record of proceedings relating thereto, the court cannot conclude that the defendant has refused or failed to comply with any court orders or the rules relating to discovery."

The various other contentions of error made by the plaintiffs do not require detailed discussion here, for, even conceding some impropriety on the part of defendant's counsel, it would not require a reversal of this lengthy, complex, and difficult trial. Moreover, some of the questions presented involve matters which must be left to the sound discretion of the trial judge. This is especially true in regard to defense counsel's examination of Dr. Goldzieher, which is claimed to have exceeded the court's ruling regarding the limitation of expert witnesses.

With respect to many of the plaintiffs' contentions, I find the view expressed in *North Chicago Street Ry. Co. v. Cotton,* 140 Ill. 486, 502-503, 29 N.E. 899, 904, very apt:

"[The trial judge] is present at the trial and has an opportunity of hearing the remarks of counsel on both sides, and is therefore able to determine much better than we can, whether anything has been said, or any incident has transpired during the trial which justifies the remarks in which counsel see fit to indulge. Many things may take place at the trial, and many things may be and usually are said on both sides of which the record affords us no intimation * * *. In clear cases this court will reverse * * * judgment in consequence of improper remarks to the jury. But this is always done with hesitation and reluctance, the court indulging, as it has a right to, in the presumption that the trial judge has performed his duty in restraining improper conduct on the part of counsel * * *.

"The trial judge * * * may interpose of his own motion and restrain counsel when plainly transgressing the rules which should govern them. * * * If counsel will persist, notwithstanding the admonitions of the court * * * it is within the power of of the court, and it may become its duty, to wrest from them any improper advantage they may have thereby gained, by setting the verdict aside and awarding a new trial. But when the record comes to this court bearing with it the official sanction of the trial judge, very different questions are presented. Every reasonable presumption must be indulged in that the trial judge has performed his duty and has properly exercised the discretion vested in him, and that he has permitted no misconduct of counsel materially prejudicial to the opposite party to intervene, unless

such misconduct and its prejudicial nature are clearly shown by the record."

For all the aforementioned reasons, the verdict and judgment in both cases should, in my opinion, be affirmed.